Charles D. Swift
Attorney for William Millay
Swift & McDonald, P.S.
1809 – 7th Avenue, Suite 1108
Seattle, WA  98101
(206) 441-3377
cswift@prolegaldefense.com

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| UNITED STATES | ) | |
| | ) | CASE NO. 3:13-MC-00005-RRB |
| V. | ) | |
| | ) | MOTION TO DISCLOSE AND |
| MILLAY, WILLIAM COLTON | ) | SUPPRESS FISA-DERIVED |
| SPC, U.S. Army | ) | EVIDENCE |
| | ) | |

DATED this 1st day of March, 2013.

Respectfully submitted,

*s/ Charles D. Swift*
Charles D. Swift
Attorney for William Millay
Swift & McDonald, P.S.
1809 – 7th Avenue, Suite 1108
Seattle, WA  98101
(206) 441-3377
cswift@prolegaldefense.com
WA State Bar No. 41671

# TABLE OF CONTENTS

**INTRODUCTION** ......................................................................................... 1

**STATEMENT OF FACTS** ........................................................................... 1

**PROCEDURAL HISTORY** .......................................................................... 5

**STATUTORY FRAMEWORK** ..................................................................... 6

Electronic Surveillance under FISA ...................................................... 6

 Physical Searches under FISA ............................................................. 10

**ARGUMENT** .............................................................................................. 12

**I. TO ENSURE EFFECTIVE REVIEW IN THIS CASE, THE FISA MATERIALS
SHOULD BE DISCLOSED TO DEFENSE COUNSEL** .......................................... 12

**II. SPC MILLAY HAS STANDING TO CHALLENGE THE FISA SURVEILLANCE
AND PHYSICAL SEARCHES** ................................................................... 13

**III. EVIDENCE DERIVED FROM THE FISA SURVEILLANCE AND PHYSICAL
SEARCHES OF SPC MILLAY SHOULD BE SUPPRESSED BECAUSE FISA IS
UNCONSTITUTIONAL UNDER THE FOURTH AMENDMENT** ..................... 13

 A. The Patriot Act Amendments, Requiring Only That Foreign Intelligence Gathering Be a
 "Significant Purpose" of FISA Surveillance and Physical Searches, Violate the Fourth
 Amendment ............................................................................................. 14

 B. Physical Searches Conducted Solely Based on FISA Authorization Violate the Fourth
 Amendment's Warrant Requirements ...................................................... 20

**IV. EVIDENCE DERIVED FROM THE FISA SURVEILLANCE AND PHYSICAL
SEARCHES OF SPC MILLAY SHOULD BE SUPPRESSED BECAUSE THE USE OF**

**FISA IN THIS CASE FAILED TO SATISFY CONSTITUTIONAL AND STATUTORY REQUIREMENTS** ................................................................................................ 24

A. *The Use of FISA Surveillance and Physical Searches Did Not Have a "Significant Purpose" of Obtaining Foreign Intelligence Information* ........................................ 24

B. *The Physical Searches of SPC Millay's Property, Based Solely on FISA Authorization, Cannot Be Justified Under Any Fourth Amendment Exception* ............................... 25

C. *The Authorization to Conduct FISA Surveillance and Physical Searches Lacked Probable Cause Under the Statute* .......................................................................... 28

    *1. There was no probable cause to believe SPC Millay was an agent of a foreign power* ........................................................................................................................ 28

    *2. There was no probable cause to believe SPC Millay was engaged in clandestine intelligence gathering* .............................................................................................. 31

    *3. The FISA applications and authorizations were based on SPC Millay's protected First Amendment rights* ............................................................................................ 32

    *4. There was no probable cause to believe that the premises searched contained foreign intelligence information* .............................................................................. 33

D. *The FISA Applications May Have Lacked the Statements and Certifications Required by Statute* ................................................................................................................. 34

    *1. The FISA applications may not have included the required statements* ....... 35

    *2. The FISA applications may not have included the required certifications* ... 36

E. *The Government May Have Failed to Set out And/ Or Comply with the Minimization Procedures Required by Statute* ............................................................................... 39

*F. The FISA Applications May Have Been Based on Illegitimate And/Or Illegal Sources of Information* ............................................................. 39

*1. The FISA applications may have been based on information obtained through surveillance based on the FISA Amendments Act* ................................................... 40

*2. The FISA applications may have been based on information obtained through surveillance based on the Patriot Act* ...................................................... 42

*3. The FISA applications and materials may have contained or been based on unrealiable "raw intelligence reports"* ................................................. 43

*G. The FISA Applications May Have Contained Intentional or Reckless Falsehoods or Omissions, Requiring a Franks Hearing* ................................................ 44

**V. THE COURT SHOULD DIRECT THE GOVERNMENT TO PROVIDE THE FISA APPLICATIONS AND MATERIALS TO SPC MILLAY'S COUNSEL BECAUSE THE STATUTE AND DUE PROCESS REQUIRE DISCLOSURE IN THIS CASE** ..... 46

*A. Disclosure of the FISA Materials to the Defense is Necessary Under 50 U.S.C. §§ 1806(f), 1825(g)* ....................................................... 47

*B. Disclosure of the FISA Materials to the Defense is Necessary Under 50 U.S.C. §§ 1806(g), 1825(h), and the Due Process Clause* ...................................... 49

**CONCLUSION** ................................................... 50

## INTRODUCTION

This Court should review and suppress the FISA-derived evidence because the underlying FISA warrant was obtained in violation of the statute and the First and Fourth Amendments. As argued below, the FISA warrant is invalid on three major grounds. First, the FISA statute is facially invalid on Fourth Amendment grounds as a result of the PATRIOT Act amendments, which broadened FISA's application to domestic criminal investigations with a significant foreign intelligence purpose. Second, FISA's physical search authorization is facially invalid as a violation of the Fourth Amendment. Third, as applied in SPC Millay's case, the use of FISA was unconstitutional because the investigation lacked requisite Fourth Amendment protections, including probable cause; foreign intelligence was not a significant purpose of the investigation; and various procedural necessities may not have been met.

In addition to suppression, Specialist (SPC) William Millay, USA, asks that this Court order the production of the FISA applications and underlying materials to his defense counsel. Production of these materials will allow defense counsel to assist this Court in its determination of the legality of the FISA surveillance, will protect SPC Millay's due process rights to a fair trial, and is appropriate—and in fact required—by statute in this case.

## STATEMENT OF FACTS

On or approximately September 14, 2011, the Federal Bureau of Investigation began an undercover sting operation targeting SPC William Millay, a military policeman in the United States Army serving on Joint Base Elmendorf-Richardson. The basis for that operation and the course it took, are set forth below.

On June 17 and 18 2011, SPC Millay made a series of six phone calls ranging in length from 2 minutes to 13 minutes to public numbers at the Russian Embassy in Washington, D.C.

1

SPC Millay recalls asking for contact information for Russian soldiers with whom he could correspond. SPC Millay's recollection of the calls is that he did not provide contact information for himself. SPC Millay remembers that the Embassy did not seem to understand what he was asking for and it became apparent that the Embassy could not help him. Thereafter, on June 22, 2011, SPC Millay wrote an email to the Russian Newspaper, Red Star, identifying himself as a US soldier and asking for a phone number to speak a Russian Military base or soldier. When both efforts to make contact with Russian soldiers failed, SPC Millay discontinued his efforts to contact members of the Russian military. At some date unknown to defense counsel, but presumably after SPC Millay attempted to make contact with Russian soldier, and solely because of SPC Millay's attempt to establish a contact with members of the Russian military, the government applied for and acquired an order authorizing electronic surveillance under FISA. The chronology of events indicates that the government may have subsequently applied to extend this FISA authorization to conduct surveillance on SPC Millay up and until his arrest. The first known conversation that is know by the defense to be recorded pursuant to the FISA order took place on September 10, 2011.

Thereafter, on September 14, 2011, an undercover FBI agent contacted SPC Millay posing as 'Natalia Petrova,' an intelligence agent employed by the Russian government. She arranged a meeting with SPC Millay at the Juno Restaurant in the Crown Plaza Hotel in Anchorage, Alaska. At the meeting, 'Natalia' solicited SPC Millay for military and national defense information relating to the United States government. In response to her questioning, SPC Millay indicated that he was a military policeman and had little to no involvement with intelligence matters. When pressed, however, SPC Millay indicated that he had access to buildings on Joint Base Elmendorf-Richardson (JBER), to personal information concerning high-

ranking personnel at JBER, and to information regarding the Duke and Warlock systems—systems capable of blocking cell phone detonated IEDs.

On September 15, 2011, SPC Millay reported his contacts with 'Natalia' to his chain of command. He had a meeting with Agent Larry Lambert regarding the contacts. Statements made in this meeting are the basis of Charge III, Specifications I & II - making false official statements. On or about September 16, 2011, SPC Millay had a meeting with Special Agent Brendan Morris and Special Agent David Noyes of the FBI regarding the contacts with 'Natalia' that he reported to his chain of command. Later that evening, SPC Millay contacted the FBI Anchorage Division switchboard.

On September 17, 2011, SPC Millay contacted federal investigators to inform them that he had been contacted again, presumably by 'Natalia.' Later that same day, SPC Millay met in person with Special Agent Derrick DeShawn Criswell, Coy, and Klein. On September 22, 2011, SPC Millay contacted his friend Joshua D. Cummings and told him that he had flipped again and wanted to make money by helping both sides. He talked to Cummings about what the Russians wanted and how they wanted their money. This conversation is the basis of Charge IV, Specification I - espionage. On September 30, 2011 and October 1, 2011, SPC Millay and 'Natalia' had multiple conversations, attempting to set up a meeting for those days.

On October 19, 2011, SPC Millay and 'Natalia' again talked on the phone and discussed meeting and payment for services. On October 21, 2011, the FBI surveilled SPC Millay as he left JBER and headed to the exchange he had discussed with 'Natalia.' The FBI texted instructions to SPC Millay on where he should leave the information that he brought to sell. The FBI also observed him leave an envelope in a designated trash can. Inside the envelope were two typed pages of information, a diagram appearing to come from a PowerPoint presentation,

3

and a photograph of a Duke system mounted on the back of an HMM/VV.  According to the Government, the information appeared to be extracts from the internet combined with SPC Millay's personal commentary on the Duke and Warlock systems and what SPC Millay perceived as weaknesses with those systems as well as information concerning capabilities of the F22 Raptor.  The FBI instructed SPC Millay on where to pick up his payment and then observed him go to the designated location and pick up payment and a new cell phone.

On October 26 and 27, 2011, stating that her "people" were dissatisfied that SPC Millay had not provided her with secret information, 'Natalia' requested intelligence from SPC Millay that was not publicly available on the internet.  SPC Millay was arrested on October 28, 2011 by Army law enforcement.

In conjunction with his arrest, on October 28, 2011, FBI agents with purported authorization of SPC Millay's Commanding officer, performed physical searches of SPC Millay's barracks room and personal vehicle on Joint Base Elmendorf-Richardson with Military Intelligence officers observing.[1]  During the search of SPC Millay's vehicle the FBI seized: a machete with a green sheath, two .44 mag. bullets, a receipt dated 10/ 06/11, receipts from Cash American Pawn and Birchwood Rec. & Shooting Park and for a weapon - S/N MG2.1209, and a CD labeled music mix.  During the search of his barracks room the FBI seized CDs & DVDs San Disk 4GB Memory Stick, a safe containing knife (140 mm blade), a Navy Federal credit card, and the following ammunition: 91 rounds of 9mm, 48 rounds of 45 caliber, 7 rounds of 7.62 x 39, magazine loaded with 21 rounds of LC04 -ARB Magazine, 3 rounds .38 SPCL, 2 rounds .357 caliber, a receipt from gun & ammo Sportsman' s Warehouse, ammo - 44 caliber (15

---

[1] Although authorization for the search was obtained from SPC Millay's Commanding Officer, the government in its previous filing indicated that it intended to admit evidence from physical searches conducted pursuant to FISA authorization, presumable as a primary or an alternative theory for evidence obtained during the search of SCP Millay's vehicle and barracks.  The defense separately in SPC Millay's court-martial contests the admissibility of the searches of SPC' Millay's barracks and vehicle pursuant to Mil. R. Evid. 311 andf 315.

4

rounds), a box containing 3 cell phones with 3 SIM cards, an empty gun case for a Taurus.44mag

5 shot, post-it notes containing phone numbers, grey folder containing vehicle titles, insurance

information, & miscellaneous paperwork, two receipts for AT&T Paperwork for wireless Go

phones, a receipt for $488.90, a S&W 38 Special five round S/N CSE0478, five rounds of a

Winchester 38 SPL+P, a black cell phone, a machete, black with sheath, Western Union Receipt,

Denali Alaska Credit Union statement, black hood and animal trap, two black gloves and one

black watch cap, black sweat pants, a letter from National Socialist Movement, a black hoody, a

gold handled butterfly knife, $245 cash, a GCI contract, a S&W Box with paperwork, a 9mm

Luger PMC round, an X-Box 360 console S/N 900059573707 and A/C adapter, one syringe and

two unused catheters, one used catheter,  a Tourniquetr G2726 Pistol receipt for $200, a Glock

pistol receipt for  $274, a hand written contract for AK-47 pistol, hand written directions, a green

memo pad, hand written notes, a .44 Taurus revolver S/N 05213467, 40 - .44 Mag HSM, 15

Winchester .38 special, 5  Aquila .38 SPL, one Aquila .38 SPL Expanded cartridge, 19 - PMC

.44 mag, and 120 GB Zune S/N 006728590915.[2]

## PROCEDURAL HISTORY

On or about September 10, 2011, the Federal Bureau of Investigation began an

investigation of SPC Millay utilizing, among other things, FISA authorization for search and

surveillance to support the undercover sting operation that had been initiated against SPC Millay,

which resulted in his arrest on October 28, 2011.  On the same day he was arrested, military

authorities ordered SPC Millay to be held in pretrial confinement, where he is still being held.

On November 7, 2011, SPC Millay was charged with the violating four articles of the

Uniform Code of Military Justice. Specifically, he was charged with espionage, 10 U.S.C. §

---

[2] A Declaration of William Millay outlining the pertinent facts is being filed with an electronic signature.  An original Declaration with an original signature of William Millay will be field separately.

906a, failure to obey an order or regulation, 10 U.S.C. § 892, false official statements, 10 U.S.C. § 907, and three specifications under the UCMJ General Article, 10 U.S.C. § 934, for wrongfully soliciting another to violate 10 U.S.C. § 892 and willfully communicating national defense information to those not entitled to receive it.

On August 3, 2012, the charges were referred for trial to the general court-martial convened by Court-Martial Convening Order Number 15. A docket request was filed in the Fourth Judicial Circuit on August 7, 2012, by both the prosecution and defense. On August 9, 2012, Colonel David Conn issued a pretrial order setting the trial date for January 7, 2013.

On September 11, 2012, the Government provided notice to the Court and defense counsel of its intent to use FISA-derived evidence at trial. As a result, defense counsel stated its intent to file a motion to suppress any FISA derived evidence.

On October 11, 2012, defense counsel for SPC Millay filed a motion opposing the adjudication of the FISA suppression by a federal district court. The government opposed. Argument was heard on November 1, 2012, and the presiding judge granted the motion on the grounds that the Attorney General had not issued an affidavit pursuant to 18 U.S.C. § 1806(f). On November 7, 2012, the Government filed a motion for reconsideration, which was opposed by defense counsel. On November 13, 2012, Judge Grammel issued an order granting the Government's motion for reconsideration, and ordered the FISA issues removed to this Court.

## STATUTORY FRAMEWORK

### Electronic Surveillance under FISA

In 1968, Congress enacted Title III of the Omnibus Crime Control and Safe Streets Act ("Title III"). *See* 18 U.S.C. §§ 2510–2522. Title III authorizes the federal government to obtain warrants for surveillance of oral, wire, and electronic communications for criminal investigation

purposes, upon a showing of probable cause that the target of the surveillance has engaged, or will engage in a federal crime, using the subject mode of communication. 18 U.S.C. § 2518. Title III's warrant requirement was based on the Supreme Court's recognition that individuals have reasonable expectation of privacy in such communications, which is protected by the Fourth Amendment. See *Berger v. New York*, 388 U.S. 41 (1967); *Katz v. United States*, 389 U.S. 347 (1967). Title III explicitly did not address foreign intelligence surveillance. 18 U.S.C. § 2511.

In 1978, Congress enacted the Foreign Intelligence Surveillance Act ("FISA"). 50 U.S.C. §§ 1801-1812. FISA authorizes the federal government to obtain warrants for surveillance of oral, wire, and electronic communications for foreign intelligence purposes, upon a showing of probable cause that the target of the surveillance is a foreign power or an agent of a foreign power – defined in several ways, including a U.S. person engaging in clandestine intelligence activities on behalf of a foreign power or its agent. Additionally, the government must show that the places that the surveillance is directed are used by the foreign power or agent thereof. To conduct a physical search under FISA, the government must meet both of those requirements, and additionally show probable cause to believe the physical location contains foreign intelligence information.

FISA's provisions represented a balance between the preservation of Fourth Amendment privacy rights, and the government's national security need to monitor agents of a foreign power operating in the United States. *See In re Kevork*, 788 F.2d 566, 569 (9th Cir. 1986) (FISA "was enacted in 1978 to establish procedures for the use of electronic surveillance in gathering foreign intelligence information. . . . The Act was intended to strike a sound balance between the need for such surveillance and the protection of civil liberties.") (internal quotations omitted). [3]

---

[3] *See, e.g.,* FINAL REPORT OF THE SELECT COMMITTEE 3 TO STUDY GOVERNMENTAL OPERATIONS WITH RESPECT TO INTELLIGENCE ACTIVITIES, S. Rep. No. 94-755, 94th Cong., 2d Sess. (1976); *Commission on CIA Activities Within*

In that context, FISA authorizes the federal government to engage in "electronic surveillance" in order to acquire "foreign intelligence information." Specifically, a federal officer acting with the approval of the Attorney General may make an application to a specialized court – known as the Foreign Intelligence Surveillance Court (hereinafter "FISC") – for a judicial order authorizing the electronic surveillance.[4] 50 U.S.C. § 1804.  After making certain findings, the FISC judge may issue an *ex parte* order approving the electronic surveillance. 50 U.S.C. § 1805(a).

The statute defines "electronic surveillance" to include, among other things, the acquisition of the contents of wire or radio communications sent by or intended to be received by a United States citizen or legal permanent resident who is in the United States. 50 U.S.C. § 1801(f)(1)-(4), (i). The statute defines "foreign intelligence information," in relevant part, to mean information concerning a United States person that is necessary to the ability of the U.S. to protect against attacks or hostile acts by a foreign power or agent of foreign power, or to protect similarly against terrorism or clandestine intelligence gathering activities. 18 U.S.C. § 1801(e)(1)-(2).

The statute requires the government's application to the FISA Court to be made under oath by a federal officer and contain certain information and certifications. 50 U.S.C. § 1804(a). The application must include the identity of the federal officer making the application, §

---

the United States, Report to the President (1975) (commonly referred to as the "Rockefeller Commission Report") (noting the need for FISA in light of abuses of surveillance during Watergate era); FOREIGN INTELLIGENCE SURVEILLANCE ACT REPORT, TOGETHER WITH SUPPLEMENTAL, ADDITIONAL, AND DISSENTING VIEWS, H.R. Rep. No. 95-1283, at 15, 95th Cong., 2d Sess. (1978) (noting that FISA was calibrated to balance between the "competing demands of the President's constitutional powers to gather intelligence deemed necessary to the security of the Nation, and the requirements of the Fourth Amendment."). *See also United States v. Belfield*, 692 F.2d 141, 145 (D.C. Cir. 1982) ("[r]esponding to post-Watergate concerns about the Executive's use of warrantless electronic surveillance, Congress, with the support of the Justice Department, acted in 1978 to establish a regularized procedure for use in the foreign intelligence and counterintelligence field").

[4] The statute also authorizes electronic surveillance without court orders in limited circumstances not applicable here. *See* 50 U.S.C. § 1802(a)(1)(A); 1805(e), 1811.

Case 3:13-mc-00005-RRB   Document 16   Filed 03/04/13   Page 12 of 55

1804(a)(1); the identity or description of the target, § 1804(a)(2); and "a statement of the facts and circumstances relied upon by the applicant to justify his belief that: the target of the electronic surveillance is a foreign power or an agent of a foreign power; and each of the facilities or places at which the electronic surveillance is directed is being used, or is about to be used by a foreign power or an agent of a foreign power." § 1804(a)(3). Also, the application must provide a "statement of the proposed minimization procedures," § 1804(a)(4), and a "description of the nature of the information sought and the type of communications or activities to be subjected to surveillance." § 1804(a)(5).

In addition, the application must include a number of "certifications," including: the certifying official deems the information sought to be foreign intelligence information, § 1804(a)(6)(A); the purpose of the surveillance is to obtain foreign intelligence information, § 1804(a)(6)(B); such information cannot reasonably be obtained by normal investigative techniques, § 1804(a)(6)(C); a designation of the type of foreign intelligence information being sought according to the categories describe in section 1801(e), § 1804(a)(6)(D); and a statement of the basis for the certification that: the information sought is the type of foreign intelligence information designated and such information cannot reasonably be obtained by normal investigative techniques, § 1804(a)(6)(E). Finally, the application must state the means by which surveillance will be effected, § 1804(a)(7); facts concerning related FISA applications, § 1804(a)(8); and the period of time for which the electronic surveillance is required to be maintained, § 1804(a)(9). In addition, the Attorney General must personally review the application and determine whether it satisfies the criteria and requirements set forth in FISA. § 1804(d); *see* § 1805(a)(1).

In considering an application for electronic surveillance pursuant to FISA, the FISC must make certain findings in order to grant the application. 50 U.S.C. § 1805. Among these findings are that the application was made by a federal officer and approved by the Attorney General, § 1805(a)(1); that there exists probable cause to believe that "the target of the electronic surveillance is a foreign power or an agent of a foreign power . . . and . . . each of the facilities or places at which the electronic surveillance is directed is being used or is about to be used by a foreign power or agent of a foreign power," § 1805(a)(2)(A-B); that the proposed minimization procedures meet the statutory definition under section 1801(h), § 1805(a)(3); and that the application contains all required statements and certifications, § 1805(a)(4).

Also, in accordance with section 1805(a)(4), if a target is a "United States person,"[5] the FISC must determine whether the "certifications" under section 1804(a)(6)(E) – namely that the information sought is "the type of foreign intelligence information designated," and the information "cannot reasonably be obtained by normal investigative techniques" – are "not clearly erroneous." In addition, section 1805(a)(2)(A) provides "that no United States person may be considered a foreign power . . . solely upon the basis of activities protected by the first amendment . . ." Orders authorizing FISA wiretaps are issued for certain specified periods of time, but may be extended pursuant to additional applications. §§ 1805(d)(1)-(2).

**Physical Searches under FISA**

In 1994, Congress amended the FISA statute to also allow for authorization of physical searches. Pub. L. No. 103-359, 108 Stat. 3444 (Oct. 14, 1994). FISA defines "physical search" as:

Any physical intrusion within the United States into premises or property (including examination of the interior of property by technical means) that is

---

[5] As a U.S. citizen, SPC Millay qualifies as a "United States person" under § 1801(i).

10

intended to result in a seizure, reproduction, inspection, or alteration of information, material, or property, under circumstances in which a person has a reasonable expectation of privacy and a warrant would be required for law enforcement purposes.

50 U.S.C. § 1821(5). The provisions regarding physical searches, 50 U.S.C. §§ 1821-1829, track those dealing with electronic surveillance, and the requirements for applications and authorizations are largely the same.

There are, however, a few significant differences in what the government must do when seeking to perform physical searches under FISA. An application for an order authorizing physical searches under FISA must include "a description of the premises or property to be searched and of the information, material, or property to be seized, reproduced, or altered," 50 U.S.C. § 1823(a)(2), as well as "a statement of the facts and circumstances relied upon by the applicant to justify the applicant's belief that . . . the premises or property to be searched contains foreign intelligence information." § 1823(a)(3)(B). "Where the physical search involves a search of the residence of a United States person, the Attorney General shall state what investigative techniques have previously been utilized to obtain the foreign intelligence information concerned and the degree to which these techniques resulted in acquiring such information." § 1823(a)(7). Orders authorizing physical searches must direct "that the Federal officer conducting the physical search promptly report to the court the circumstances and results of the physical search." § 1824(b)(2)(E).

Case 3:13-mc-00005-RRB   Document 16   Filed 03/04/13   Page 15 of 55

## ARGUMENT

## I.   TO ENSURE EFFECTIVE REVIEW IN THIS CASE, THE FISA MATERIALS SHOULD BE DISCLOSED TO DEFENSE COUNSEL

As an initial matter, SPC Millay requests that the Court order the disclosure of the subject FISA applications to him and/ or his counsel, in order to allow him to make an effective motion to suppress the FISA-derived evidence. Neither SPC Millay nor his counsel has seen the subject FISA applications because they were made *ex parte* and were not subsequently disclosed. Therefore, SPC Millay makes this motion without the benefit of necessary and relevant facts, and upon information and belief.  As discussed *infra* at Part V, disclosure in this case is both authorized by statute and required by due process.

In the event that this court does not authorize disclosure, the level of specificity usually required in a motion to suppress should be relaxed. The lack of access to the underlying FISA materials presents a significant impediment to the defendant's capacity to challenge FISA surveillance with particularity. Given that FISA applications, applications for extension, orders, and related materials have not been disclosed to defense counsel, the grounds for relief set forth below represent defense counsel's best estimation of the deficiencies in the use of FISA in this case. A relaxation in the particularity requirement is appropriate when the defendant is deprived of access to the material facts. *See United States v. Valenzuela-Bernal*, 458 U.S. 858, 870-71, 873 (1982)) (holding that when the defense was denied access finding material facts from a deported witness under government's exclusive control, the requirements for specificity should be relaxed accordingly).

## II. SPC MILLAY HAS STANDING TO CHALLENGE THE FISA SURVEILLANCE AND PHYSICAL SEARCHES

SPC Millay has standing to move to suppress the FISA-derived evidence used against him in his criminal prosecution. Under FISA, an "aggrieved person," is defined as "a person who is the target of an electronic surveillance or any other person whose communications or activities were subject to electronic surveillance," or one "whose premises, property, information, or material was subject to physical search." 50 U.S.C. §§ 1801(k), 1821(2). An "aggrieved person" may move to suppress evidence obtained or derived from FISA electronic surveillance or physical searches on the grounds that "the information was unlawfully acquired" or "the surveillance was not made in conformity with an order of authorization or approval." §§ 1806(e)(1)-(2), 1825(f)(1). Here, because SPC Millay was the direct target of FISA electronic surveillance, he is an "aggrieved person" under §§ 1806(k) and 1821(2), and he moves to suppress FISA-derived evidence because, based on the limited facts known to him, it was unlawfully acquired and the surveillance made did not conform to the order of authorization.

## III. EVIDENCE DERIVED FROM THE FISA SURVEILLANCE AND PHYSICAL SEARCHES OF SPC MILLAY SHOULD BE SUPPRESSED BECAUSE FISA IS UNCONSTITUTIONAL UNDER THE FOURTH AMENDMENT

The FISA statute does not pass constitutional muster under the Fourth Amendment because both the "significant purpose" standard and the standard for physical searches fail to meet minimum Fourth Amendment requirements. Therefore, the statute is facially invalid, and the Court should suppress all FISA- derived evidence.

The Court should not rely on *United States v. Ott* in reaching any conclusions about the Fourth Amendment claims in this case. *United States v. Ott*, 827 F.2d 473 (9th Cir. 1987) *Ott* is

the only published Ninth Circuit case in which a federal district court adjudicated a motion to suppress FISA evidence arising from a court-martial proceeding.  The challenges in *Ott* were limited to two issues: 1) Ott sought suppression and discovery of the FISA-derived evidence under 18 U.S.C. § 1806(f), based on the facts of his case, and 2) Ott challenged as an unconstitutional due process deprivation the *ex parte, in camera* review provided under 18 U.S.C. 1806(f), as a violation of Ott's rights to assistance to counsel and to confront witnesses against him. *United States v. Ott*, 637 F.Supp. 62, 64-65 (E.D. Cal. 1986).

The rulings in *Ott* do not apply here. First, suppression and discovery of FISA-derived evidence under section 1806(f) is evaluated on a case-by-case basis, specific to the factual intricacies of the individual circumstance. Therefore, any determination as to the legality of FISA surveillance as applied in SPC Ott's case has no bearing here.  Second, SPC Millay's constitutional claims arise under the Fourth Amendment, see *infra*; they do not arise under the due process clause.  These are two wholly distinct inquiries, and a constitutional ruling on due process should not influence this court's Fourth Amendment constitutional analysis. Moreover, the earlier version of the FISA statute litigated in *Ott* did not contain the physical searches provision or the "significant purpose" standard, so the case has no bearing upon SPC Millay's Fourth Amendment claims.

### A. The Patriot Act Amendments, Requiring Only That Foreign Intelligence Gathering Be a "Significant Purpose" of FISA Surveillance and Physical Searches, Violate the Fourth Amendment

The USA PATRIOT Act amendments to FISA, § 218 (2001), codified at 50 U.S.C. § 1804(a)(6)(B) [hereinafter "Patriot Act"], which broadened FISA's application to domestic criminal investigations with a significant foreign intelligence purpose, have rendered the statute

14

unconstitutional. Orders authorizing surveillance or physical searches pursuant to FISA do not satisfy the Fourth Amendment's warrant requirements of probable cause, particularity, and reasonableness. Although courts have established a foreign intelligence exception to the Fourth Amendment's warrant requirements, they have limited the exception to cases in which foreign intelligence is the primary purpose of the use of FISA. The Patriot Act amendments, requiring only that foreign intelligence be a "significant purpose" of the investigation, bring the use of FISA outside the foreign intelligence exception, and thus violate the Fourth Amendment's warrant requirements.

The Fourth Amendment requires a warrant for all searches, including electronic surveillance, conducted for the purpose of a domestic criminal investigation. Such a warrant must be supported by probable cause that a crime is being or will be committed by the target, using the subject means or method of communication. *Berger*, 388 U.S. at 55-56. The warrant must also state with particularity the places or items to be searched or seized. U.S. CONST. amend. IV; *see also Marron v. United States*, 275 U.S. 192, 195 (1927). A warrant ordered by a neutral magistrate based upon a showing of probable cause is the irreducible minimum of Fourth Amendment protection of privacy from arbitrary searches. *Katz*, 389 U.S. at 356; *see also Dalia v. United States*, 441 U.S. 238, 255 (1979).

FISA departs from the Fourth Amendment's minimum requirements in two respects. First, FISA authorization is not based upon the Fourth Amendment's probable cause standard for other searches and seizures. FISA requires only a showing that the surveillance target is a foreign power or agent of a foreign power. *See* 50 U.S.C. § 1804(a)(3)(A). Second, FISA warrants do not satisfy the Fourth Amendment's particularity requirement. The Fourth Amendment requires a warrant to describe with particularity the things to be seized and the places to be searched. *See*

*Berger*, 388 U.S. at 58. By contrast, no such showing of particularity is required for the issuance of a FISA warrant.

Although FISA warrants depart from the Fourth Amendment's minimum protections in these two crucial respects, courts have concluded that FISA-derived evidence may be used in criminal prosecutions, subject to an important limitation. FISA's requirement that the intelligence be conducted for the "primary purpose" of foreign intelligence, not criminal investigation, limits the instances in which FISA-derived evidence may be used in criminal prosecutions. *See United States v. Truong Dinh Hung*, 629 F.2d 908, 915 (4th Cir. 1980) (foreign intelligence exception to Fourth Amendment requirements in FISA is limited to cases in which "the surveillance is conducted primarily for foreign intelligence reasons."). Numerous courts have cemented FISA's "primary purpose" of foreign intelligence gathering as an axiomatic requirement for a Fourth Amendment exception. *See e.g., United States v. Johnson*, 952 F.2d 565, 572 (1st Cir. 1991) ("Although evidence obtained under FISA subsequently may be used in criminal prosecutions . . . the investigation of criminal activity cannot be the primary purpose of the surveillance. [FISA] is not to be used as an end-run around the Fourth Amendment's prohibition of warrantless searches."); *United States v. Butenko*, 494 F.2d 593, 606 (3d Cir. 1974) (en banc) ("Since the primary purpose of these searches is to secure foreign intelligence information, a judge, when reviewing a particular search must, above all, be assured that this was in fact its primary purpose and that the accumulation of evidence of criminal activity was incidental."); *United States v. Bin Laden*, 126 F. Supp. 2d 264, 277-78 (S.D.N.Y. 2000) (finding foreign intelligence exception to the Fourth Amendment's warrant requirement for searches abroad where the search is "conducted 'primarily' for foreign intelligence purposes").

16

In 2001, Section 218 of the Patriot Act amended 50 U.S.C. § 1804(a)(6)(B) to allow the issuance of a FISA warrant so long as a "significant" purpose of the electronic surveillance is to gather foreign intelligence information. Patriot Act § 218. The amendment effectively lowered the threshold foreign intelligence purpose standard, required to obtain a FISA warrant, from "primary purpose" to "significant purpose," potentially allowing FISA warrants even when the intelligence gathered is primarily for criminal prosecution purposes. *See In re Sealed Case No. 02-001*, 310 F.3d 717, 735 (FISA Ct. Rev. 2002). Under the "significant purpose" standard, if the government can show that FISA-derived evidence was gathered for a secondary foreign intelligence purpose, it can circumvent the heightened probable cause requirement associated with criminal warrants and execute surveillance using FISA's relaxed probable cause standard. *See Id*.

FISA's "significant purpose" standard violates the Fourth Amendment because it allows the use of FISA warrants, obtained with lower probable cause showings, in cases where criminal prosecution is the primary purpose for obtaining the intelligence.[6] In other words, the government may claim that a "significant purpose" of FISA surveillance in a particular case was for foreign intelligence gathering, even though the "primary purpose" was for criminal investigation. By allowing that end-run around the limits on criminal investigations, FISA infringes upon the Fourth Amendment's probable cause and particularity requirements.

Finally, FISA's significant purpose standard fails to meet the Fourth Amendment standard of reasonableness because it fails to balance citizens' reasonable expectation of privacy with the need of the government to gather foreign intelligence information. *Katz,* 389 U.S. at

---

[6] Even if the significant purpose standard is declared constitutional, the Patriot Act provisions dismantling the "wall" between criminal and foreign intelligence information sharing will remain intact. *See* Patriot Act § 203(b) & (d) (2001), codified at 18 U.S.C. § 2517(6) & 50 U.S.C. § 403-5d. Further, nothing would prevent the government from obtaining a warrant for criminal purposes under Title III. *See* 18 U.S.C. §§ 2510–2522.

17

322-23 (indicating that the test for determining whether or not surveillance conducted in the name of national security complies with the requirements of the Fourth Amendment is whether the surveillance is "reasonable both in relation to the legitimate need of Government for intelligence information and the protected rights of our citizens."); *Camara v. Mun. Court*, 387 U.S. 523, 536-37 (1967) (indicating that any reasonable Fourth Amendment analysis must account for individual interests). In its initial design, FISA deliberately set out to find balance between national security interests with individual liberty. However, the standard imposed by the Patriot Act wholly eliminates that balance. FISA was not intended to allow the government to engage in surveillance devoid of a primary foreign intelligence purpose. *See In re Sealed Case*, 310 F.3d at 736 ("[T]he FISA process cannot be used as a device to investigate wholly unrelated ordinary crimes."). Therefore, FISA's "significant purpose" standard violates the Fourth Amendment.

The Ninth Circuit Court of Appeals has never ruled on the constitutionality of the "significant purpose" standard. The Ninth Circuit only ruled on the constitutionality of the pre-Patriot Act FISA's primary purpose standard. *See Cavanaugh v. United States*, 807 F.2d 787 (9th Cir. 1987) (holding that FISA's probable cause requirements met the Fourth Amendment standard when "the purpose of the surveillance is to obtain foreign intelligence information."); *United States v. Sarkissian*, 841 F.2d 959, 964 (9th Cir. 1988) (declining to consider whether the primary purpose test was constitutionally required).

In 2002, the Foreign Intelligence Surveillance Court of Review (FISCR) upheld the constitutionality of the post-PATRIOT Act FISA's "significant purpose" standard. For reasons explained below, the FISCR court's reasoning was flawed in several respects.

18

First, the FISCR court itself acknowledged that "the constitutional question presented by this case-whether Congress' disapproval of the primary purpose test is consistent with the Fourth Amendment-*has no definitive jurisprudential answer*." *In re Sealed Case*, 310 F.3d at 746 (emphasis added). It further posited that the "procedures and government showings required under FISA, if they do not meet the minimum Fourth Amendment warrant standards, certainly come close." *Id.* Especially in light of the procedural irregularities stemming from review in FISCR, the court's concession about the lack of doctrinal clarity and its unfounded supposition that close is good enough render its interpretation highly unpersuasive.

Second, the FISCR Court's discussion of the Patriot Act's effect on the "significant purpose" versus "primary purpose" standard is nothing more than dicta. The FISCR court's opinion came in an appeal concerning FISA minimization procedures only. In the case below, the court had considered the Attorney General's proposed minimization procedures to implement the Patriot Act, and rejected in part and rewrote in part the procedures. *In re All Matters Submitted to the Foreign Intelligence Surveillance Court*, 218 F. Supp.2d 611, 625 (FISC 2002). The government appealed this decision in *In Re Sealed*, where the FISCR reviewed a FISA application in which the FISC rejected the government's request to follow the Attorney General's proposed procedures and granted the FISA application on condition that the government obey the FISC's order in *In Re All Matters. In re Sealed Case*, 310 F.3d. at 720-21. Therefore, the issue on appeal was whether the proposed minimization procedures were "reasonably designed," consistent with the need of the government "to obtain, produce, or disseminate 'foreign intelligence information' as defined in 1801(h) and 1821(4) of [FISA]." *See In re All Matters*, 218 F. Supp.2d at 625. Any discussion of the significant purpose standard is therefore of minimal precedential value.

Third, the *In re Sealed* opinion arose from a non-adversarial proceeding in the FISCR, where only the government was permitted to appear. Because the statute only permits the government to appeal a FISCR decision to the Supreme Court, the decision has stood since 2002 without further appeal. *See* 50 U.S.C. § 1803(b). These highly unusual procedures sharply conflict with the values inherent in traditional court proceedings, and render the decision unpersuasive and of little precedential value to a proper Article III court, such as this one.

Fourth, as set forth below, the FISCR's Fourth Amendment reasoning is incorrect. As discussed *infra* at Part III(B), FISCR's reliance on the special needs exception is misplaced.

**B. Physical Searches Conducted Solely Based on FISA Authorization Violate the Fourth Amendment's Warrant Requirements**

Even if this Court finds that the "significant purpose" standard is constitutional under the Fourth Amendment, physical searches based solely on FISA authorization are nevertheless unconstitutional. FISA orders for physical searches do not meet the Fourth Amendment's warrant requirements, nor can the physical searches be justified under the special needs or exigency exceptions, or the general reasonableness test. Although surveillance can sometimes enjoy lesser scrutiny under the Fourth Amendment, *see, e.g.*, Stored Communications Act, 18 U.S.C. 2701-2712 (2012), physical searches retain the highest level of protection under Fourth Amendment law. *See Olmstead v. United States*, 277 U.S. 438, 464 (1928) (discussing the history of the Fourth Amendment as contemplating searches of "material things-the person, the house, his papers, or his effects"). Therefore, even if electronic surveillance under FISA passes constitutional muster with a significant purpose standard, physical searchers under FISA cannot reach the Fourth Amendment threshold under the significant purpose standard.

20

Under the Fourth Amendment, warrants issue for all domestic criminal investigations, supported by probable cause that a crime is or will be committed by the target, and stating with particularity the places or items to be seized or searched. U.S. CONST. amend. IV; *Berger*, 388 U.S. at 55-56; *Marron*, 275 U.S. at 195. FISA orders for physical searches meet neither of these requirements.

First, FISA-authorized physical searches do not rest on the Fourth Amendment probable cause standard. Rather, authorization for physical searches under FISA only requires reason to believe that the intended target is a foreign power or agent of a foreign power, and that the property to be searched is connected to that person. *See* 50 U.S.C. §§ 1823(a)(3)(A) & (C). Second, while authorization for physical searches describes the places to searched, it fails to describe with particularity the things to be seized. *See* 50 U.S.C. § 1823(a)(3)(B). In fact, though the authorization requires reason to believe that the place to be searched contains foreign intelligence information, there is no requirement that the foreign intelligence information be the object of the search, nor any specificity as to the nature of that foreign intelligence information. *Id.*

There are only two relevant exceptions to the Fourth Amendment in this circumstance: the special needs exception and the exigency exception. Neither exception applies to searches authorized under FISA.

First, FISA-authorized searches do not come within the special needs exception. The special needs exception provides that when special needs outside of normal law enforcement make the warrant and probable cause requirements impracticable, a warrantless search may be justified. *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987). Generally, courts have read this rule to apply only in situations outside the scope of traditional law enforcement and criminal

21

investigation. *See, e.g.*, *City of Indianapolis v. Edmond*, 531 U.S. 32, 43 (2000) (declining to extend the special needs exception to a non-border highway checkpoint seeking to interdict narcotics because the checkpoints merely "advance[ed] a general interest in crime control"); *Ferguson v. City of Charleston*, 532 U.S. 67, 83 (2001) (declining to extend the special needs exception to hospital mandated drug tests on pregnant women because the "immediate objective of the searches was to generate evidence for *law enforcement purposes*," despite an ultimate goal to prevent substance abuse in mothers).

FISA surveillance post-2001 does not fall beyond the normal need of law enforcement and criminal investigation. Prior to 2001, FISA required a primary purpose of foreign intelligence. Patriot Act § 218 (2001), codified at 50 U.S.C. § 1804(a)(6)(B). Arguably, under this standard, FISA's programmatic purpose may have been protecting the nation against terrorism and espionage by foreign powers. Such a purpose may well have fallen beyond the normal need of law enforcement and criminal investigation, and exempted FISA from probable cause warrant requirements under the Fourth Amendment's special need exception. However, after 2001, the significant purpose standard has, in many cases, made FISA's programmatic purpose law enforcement. Despite a potential long-term goal of stopping espionage, the immediate objective of post-2001 FISA is often generating evidence for law enforcement purposes. Such an objective does not fall within the parameters of the special needs exception.

In a footnote commenting on its interpretation of the FISA surveillance statutes, the FISCR implied in dicta that the special needs exception might apply to FISA physical searches, as well as FISA surveillance. *In Re Sealed Case*, 310 F.3d at 722 n.7. However, the question of physical searches under FISA was not before the court. *Id.* Moreover, as explained above, that conclusion is incorrect. 504 F. Supp. at 1041-42.

22

Second, FISA-authorized searches do not come within the exigency exception. The Ninth Circuit has defined the exigency exception as allowing a warrantless search in "those circumstances that would cause a reasonable person to believe that entry (or other relevant prompt action) was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts." *United States v. McConney*, 728 F.2d 1195, 1199 (1984).

Such a determination is fact dependent, and cannot uniformly apply to the vast array of potential circumstances arising under FISA's physical search authorization. While there may be some circumstances that would fit within the exigency exception, the entire category of physical searches under FISA cannot. Therefore, on its face, FISA cannot fall within the Fourth Amendment's exigency exception.

Finally, the FISA-authorized physical searches cannot be excused on the basis of a "general reasonableness" standard. *See, e.g.*, *Samson v. California*, 547 U.S. 843, 852-53 (2006) (finding that a warrantless search of a parolee's home came within the Fourth Amendment's general reasonableness standard because a parolee by definition has a lesser expectation of privacy, and the government interest in ensuring that the parolee does not commit additional crimes is substantial). As the Ninth Circuit has concluded, the "general reasonableness" test requires balancing the degree to which the search intrudes upon the individual's privacy and the degree to which the search is needed to promote legitimate government interests. *Al-Haramain Islamic Foundation, Inc. v. United States Dept. of Treasury*, 686 F.3d 965, 994 (9th Cir. 2011). Like exigent circumstances, a general reasonableness inquiry is fact-dependent, and cannot

excuse the entire category of physical searches under FISA from violating the Fourth Amendment.

## IV.    EVIDENCE DERIVED FROM THE FISA SURVEILLANCE AND PHYSICAL SEARCHES OF SPC MILLAY SHOULD BE SUPPRESSED BECAUSE THE USE OF FISA IN THIS CASE FAILED TO SATISFY CONSTITUTIONAL AND STATUTORY REQUIREMENTS

Should this Court find that the Patriot Act Amendments to FISA and FISA-authorized physical searches are not facially invalid, the FISA-derived evidence should nevertheless be suppressed in this case.  The use of FISA surveillance and physical searches on SPC Millay was unconstitutional as applied to the facts of this particular case, and the Government did not satisfy all of FISA's statutory requirements, rendering the use of FISA surveillance and physical searches illegal and invalid.

### A. The Use of FISA Surveillance and Physical Searches Did Not Have a "Significant Purpose" of Obtaining Foreign Intelligence Information

Foreign intelligence gathering was not the primary or significant purpose of the government's FISA surveillance and physical searches of SPC Millay. The statute requires the Attorney General to certify that foreign intelligence is a "significant purpose" of the surveillance sought. 50 U.S.C. §§ 1804(a)(6)(B), 1823(a)(6)(B).   At the time of the FISA application, although SPC Millay had contacted the Russian embassy in an effort to establish contact with Russian soldiers he had not been successful in establishing contact. Moreover he had discontinued his efforts and there was therefore no reason to believe that he was in fact an intelligent agent of the Russian government. The government's FISA application, therefore,

lacked the "significant purpose" of foreign intelligence gathering. Rather, as evidenced by the subsequent criminal investigation conducted with the use of an undercover FBI agent posing as a Russian agent, the government's significant, primary, and indeed sole purpose was criminal investigation. Likewise, if the government re-applied for an extension of the FISA authorization for SPC Millay, there was no primary or significant foreign intelligence purpose at that later time, once the FBI investigation of SPC Millay was underway, and the FBI knew that SPC Millay had no contact with the Russian government.

**B. The Physical Searches of SPC Millay's Property, Based Solely on FISA Authorization, Cannot Be Justified Under Any Fourth Amendment Exception**

Even if the court finds that physical searches under FISA can be categorically justified under a Fourth Amendment exception, the specific facts of SPC Millay's case do not fall within a Fourth Amendment exception. Specifically, SPC Millay's case does not fall within the either the special needs or exigent circumstances exception to the Fourth Amendment, nor does it fall within the general reasonableness test. Therefore, the FISA-authorized search was in violation of SPC Millay's Fourth Amendment rights and the evidence derived therefrom should be suppressed.

First, SPC Millay's case does not fall within the Fourth Amendment's special needs exception. As discussed *supra*, the special needs exception allows law enforcement to conduct a reasonable search in absence of the warrant and probable cause requirements when a) the circumstances are outside the scope of normal law enforcement and b) meeting the warrant and probable cause requirements is impracticable. *Griffin*, 483 U.S. at 873; *Ferguson*, 532 U.S. at 83.

Such circumstances do not exist in this case. As discussed *supra*, foreign intelligence was not a significant purpose of the investigation. Instead, the government's purpose was criminal investigation, as evidenced by the government's knowledge that SPC Millay was not communicating with any foreign power, and the use of the undercover FBI agent posing as a Russian agent to investigate SPC Millay's alleged crimes. Because his investigation was within the scope of traditional law enforcement and criminal investigation, there is no special needs exception available. *See Ferguson*, 532 U.S. at 83; *see also Kindhearts for Charitable Humanitarian Development, Inc. v. Geithner*, 647 F. Supp. 2d 857, 882-83 (N.D. Ohio 2009) (finding that a special needs exception could not justify OFAC blocking actions). Consequently, the government violated the Fourth Amendment when it obtained FISA authorization to physically search SPC Millay's property, and the evidence obtained during that search should be suppressed.

Moreover, the physical search of SPC Millay's property does not fit within the Ninth Circuit's test for the special needs exception to the Fourth Amendment, set forth in *Al-Haramain Islamic Foundation*, 686 F.3d at 991. The test requires that the court weigh the nature and extent of the privacy interest at hand against the nature and immediacy of the government's concerns and the efficacy of the procedures employed in meeting those concerns. *Id.* In the context of the search of SPC Millay's home, SPC Millay's privacy interest was at its peak. *See*, *e.g.*, *Kyllo v. United States*, 533 U.S. 27, 31 (2001) ("'At the very core' of the Fourth Amendment 'stands the right of a man to retreat into his own home and there be free from unreasonable government intrusion.'") (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)). While the government's interest was also very high, it had other alternatives available to achieve its ends—

namely, a traditional criminal warrant. In light of this balancing, no special needs exception applies in SPC Millay's case.

Second, SPC Millay's case does not fall within the Fourth Amendment's exigency exception. As discussed *supra*, the exigent circumstances exception allows law enforcement to conduct a search without a warrant when a reasonable person would believe that entry was necessary to prevent physical harm, destruction of relevant evidence, escape of the suspect, or some other action frustrating law enforcement efforts. *McConney*, 728 F.2d at 1199.

There are no such circumstances here. At the time of the physical search, SPC Millay was being monitored through FISA-authorized surveillance and the FBI's confidential informant. With such extensive monitoring, there could have been no reasonable fear that SPC Millay would somehow frustrate law enforcement efforts. In fact, SPC Millay was delivering any relevant evidence that he possessed directly to the confidential informant. If there was any need to conduct a physical search, law enforcement had time to—and should have—obtained a traditional investigative warrant. There were no exigent circumstances that can excuse their failure to do so, and therefore, the physical search violated the Fourth Amendment.

Third, the search was not generally reasonable. As the Ninth Circuit has commented, the Fourth Amendment general reasonableness test mirrors its special needs exception test, and requires the balancing of personal privacy and government interests. *Al-Haramain Islamic Foundation*, 686 F.3d at 994. Unlike the cases where the government has found general reasonableness, which all involve "greatly diminished privacy interests," SPC Millay's privacy interest was at its peak here. *Id.* Given the availability of alternatives to FISA, the government's interest cannot be upheld as significant enough to justify the search under a general reasonableness standard.

### C. The Authorization to Conduct FISA Surveillance and Physical Searches Lacked Probable Cause Under the Statute

Before a FISA order can be issued authorizing surveillance or physical searches, the statute requires that the government make a number of showings of probable cause to the FISC. Those probable cause requirements, as set forth below, could not have been met in SPC Millay's case, rendering the use of FISA invalid. Accordingly, the FISA-derived evidence must be suppressed.

#### 1. There was no probable cause to believe SPC Millay was an agent of a foreign power

Before authorizing FISA surveillance or physical searches, the FISA Court must find, *inter alia*, probable cause to believe that "the target of the electronic surveillance is a foreign power or an agent of a foreign power." 50 U.S.C. §§ 1805(a)(2)(A), 1824(a)(2)(A). In the criminal context, it is well-settled that probable cause requires "'a reasonable ground for belief of guilt,'" and that "the belief of guilt must be particularized with respect to the person to be searched or seized." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (quoting *Illinois v. Gates*, 462 U.S. 213, 231 (1983)). Because FISA does not require any showing of criminal activity, the probable cause standard is directed *not* at the target's alleged commission of a crime, but at the target's alleged status as "a foreign power or an agent of a foreign power." Therefore, to satisfy probable cause in this case, the government must have shown a reasonable ground for belief that SPC Millay was an agent of a foreign power.

FISA section 1801(a) defines the term "foreign power" to include, in relevant part, "a foreign government or any component thereof, whether or not recognized by the United States." 50 U.S.C. § 1801(a)(1). Here, presumably the government argued in its FISA application that the

28

Russian government, to which the FBI undercover agent claimed she belonged, satisfied this definition of a "foreign power."

Section 1801(b) defines "agent of a foreign power," in relevant part, as:

> (2) any person who—
> (A) knowingly engages in clandestine intelligence gathering activities for or on behalf of a foreign power, which activities involve or may involve a violation of the criminal statutes of the United States;
> (B) pursuant to the direction of an intelligence service or network of a foreign power, knowingly engages in any other clandestine intelligence activities for or on behalf of such foreign power, which activities involve or are about to involve a violation of the criminal statutes of the United States; . . . or
> (E) knowingly aids or abets any person in the conduct of activities described in subparagraph (A), (B), or (C) or knowingly conspires with any person to engage in activities described in subparagraph (A), (B), or (C).

50 U.S.C. § 1801(b)(2).[7] Here, presumably the government argued in its FISA application that SPC Millay either engaged in "clandestine intelligence gathering" for the Russian government, or an agent of the Russian government, or that he conspired with the Russian government in the conduct of such activities.

The FISA authorization here was improper because SPC Millay does not meet any of the relevant statutory tests for "agent of a foreign power." First, from the inception of the FBI investigation until his arrest, the surveillance records show that SPC Millay had no contact whatsoever with the Russian government or agents of the Russian government. His only contact was with an undercover agent posing as a Russian spy. Second, the government has no evidence of any contact between SPC Millay and the Russian government at all, except for one single phone call to the Russian embassy on June 17 and 18, 2011. The contents of that phone calls, although not made available to SPC Millay or his counsel, do not form any basis for satisfying

---

[7] The remaining sub-sections of 1801(b)(2) concern knowingly engaging in sabotage or international terrorism, see § 1801(b)(2)(C), and entering the United States under a false or fraudulent identity, see § 1801(b)(2)(D), neither of which are relevant to the alleged acts or charges in SPC Millay's case. Likewise, the definitions in § 1801(b)(1) pertain only to non U.S. citizens or legal residents, and therefore do not apply to SPC Millay, who is a U.S. citizen.

the elements of section 1801(a), as SPC Millay in the calls was trying to make contact with Russian soldiers. As made clear through the calls and subsequent email, SPC Millay was unsuccessful and had discontinued his efforts, and therefore, was clearly not engaged in clandestine intelligence gathering on behalf of the Russian government. Nor can the government's insertion of a undercover operative posing as a Russian representative create the existence of clandestine activities on behalf of a foreign government .The government cannot manufacture a "foreign power" using undercover FBI agents and then seek FISA authorization. Indeed, the FISA statute explicitly provides that a "foreign power" may not be substantially composed of United States persons. *See* § 1801(a)(2), (5), (7). Moreover, if the government were allowed to conjure up foreign powers using undercover FBI agents, the FISA statute would pose virtually no check on the government's foreign intelligence surveillance powers. So long as an undercover agent posed as a foreign spy, the government would always be able to conduct surveillance on the target under FISA, even if no actual foreign power were involved. Such a result would virtually eliminate any limitation on the Executive's power to conduct surveillance. Since there is no evidence of SPC Millay's contact or association with the Russian government or with Russian agents – other than the phone calls on 17 and 18 June 2012 FISA sections 1801(a) and 1801(b) were not satisfied.

FISA's legislative history also supports this interpretation. In passing FISA, Congress noted that the statute would require something akin to a principal-agent relationship between the target and the foreign power "under which the alleged agent has undertaken to provide services for his foreign principal." S. Rep. No. 94-604(I) (1977). Therefore, in the absence of a buyer who is part of a foreign power, an offer to sell intelligence information alone would not satisfy the statutory requirements. In this case, there was never any principal-agent relationship between

SPC Millay and a foreign power or its agent. Therefore, there was no probable cause to believe that SPC Millay was an agent of a foreign power, and the FISA-derived evidence must be suppressed.

### 2. There was no probable cause to believe SPC Millay was engaged in clandestine intelligence gathering

In the alternative, even if the government had shown that SPC Millay was an agent of the Russian government, the government did not show, as required by FISA, that SPC Millay had engaged in "clandestine intelligence gathering activities," either directly or through any conspiracy. 50 U.S.C. § 1801(b)(2)(A), (B), (E). FISA does not define the term "clandestine intelligence gathering." The plain meaning of "clandestine" is "secret; hidden; concealed." BLACK'S LAW DICTIONARY (2d ed. 1910). The term "intelligence gathering" refers to activities traditionally associated with spying, such as "gathering information in a clandestine manner or conducting covert operations for a foreign power." S. REP. No. 94-604(I) (1977); *see also U.S. v. Rosen*, 447 F. Supp. 2d 538, 547 (E.D. Va. 2006) (commenting that FISA's "legislative history demonstrates that the drafters viewed these 'activities' in light of the criminal espionage laws"). The statute's drafters emphasized that regardless of the nature of the activity, "there must be a clandestine aspect" and "the collection, for whatever purpose, of information within the public domain . . . would never constitute 'clandestine intelligence activity.'" S. REP. No. 94-604(I) (1977).

In this case, there was no probable cause to believe that SPC Millay had knowingly engaged in clandestine intelligence gathering activity. First, at the time of the FISA application, SPC Millay's activities had been limited to making a series of telephone calls Russian Embassy and an email to the News Paper Red Star seeking to meet with soldiers . He had not yet met with

or talked to the undercover FBI agent posing as a Russian agent, or done anything that amounted to clandestine intelligence activity. Unlike the appellant *Ott*, as military patrolman, he hand no access to intelligence related to materials and did not work in the intelligence field. Therefore, the definition of clandestine activity could not have been met at the time of the application.

Second, if the government re-applied for an extension of the FISA authorization after SPC Millay met with the undercover FBI agent posing as a Russian spy, even at that time he had not engaged in "clandestine intelligence gathering activities." The only material he ever gathered for the FBI agent was information already in the public domain – found on the internet and available to everyone – which, as Congress stated, could not constitute "clandestine intelligence activity.'" S. REP. No. 94-604(I) (1977) ("There must . . . be an effort to obtain information which is being kept secret and is not generally available to the public, or not available to the general public."). Therefore, there was no probable cause to believe that SPC Millay had engaged in clandestine intelligence gathering.

### 3. The FISA applications and authorizations were based on SPC Millay's protected First Amendment rights

The FISA authorization in this case was improperly based on SPC Millay's protected First Amendment activity. The FISA statute expressly prohibits finding probable cause for a United States citizen like SPC Millay based solely upon First Amendment activities. 50 U.S.C. §§ 1805(a)(2)(A), 1824(a)(2)(A) (". . . Provided, that no United States person may be considered a foreign power or an agent of a foreign power solely upon the basis of activities protected by the first amendment to the Constitution of the United States; . . ."").

FISA legislative history makes clear that the provision excludes "any activity which consists solely of the lawful exercise of first amendment rights of speech, petition, assembly, and

32

association," and that "lawful political activities should never be the sole basis for a finding of probable cause to believe that a U.S. person is an agent of a foreign power." S. REP. No. 95-701 (1978). The drafters further noted that "the bill is not intended to authorize electronic surveillance when a United States person's activities, even [though] secret and conducted for a foreign power, consist entirely of lawful acts." *Id.*

In this case, the FISA authorization was improperly based on protected First Amendment activity. The FISA surveillance commenced after SPC Millay made a series of telephone call to the Russian embassy. The phone calls seeking to be put in contact with Russian soldiers was protected First Amendment activity, and it did not involve any incitement to imminent violence or other categories of unprotected (or criminal) speech. *See Brandenburg v. Ohio*, 394 U.S. 444, 447 (1969) (holding that guarantees of free speech are only limited when such speech incites or produces imminent lawless action). Thereafter, SPC Millay had no other contact with the Russian government or any agent thereof. In addition, even if SPC Millay's contact with the undercover FBI agent were relevant (which it is not for the reasons stated above in Part II(C)(1)), such contact did not begin until *after* the FISA authorization. Therefore, there was no probable cause at the time of the FISA application based on activities other than his protected telephone calls to the Russian embassy. Moreover, in the event that the government re-applied for a successive FISA authorization, the Court must also find no basis for probable cause at the time of the extension, for the same reasons above.

### 4. There was no probable cause to believe that the premises searched contained foreign intelligence information

Before authorizing a physical search under FISA, FISA Court must find probable cause to believe that the property to be searched contains foreign intelligence information. *See* 50

U.S.C. § 1823(a)(3)(B). Section 1801(e), defines "foreign intelligence information," in relevant part, as information necessary to the United States' ability to protect against various threats, including clandestine intelligence activities, by an agent of a foreign power.[8] *See* 50 U.S.C. § 1801(e)(1)(A)-(C).

As discussed *supra*, there is no involvement of an agent of a foreign power in these circumstances. The government has no evidence of any contact between SPC Millay and the Russian government at all, apart from his single phone call to the Russian embassy. Thereafter and until his arrest, he had no contact with the Russian government or agents of the Russian government. In sum, there was not and could not have been any principle-agent relationship between SPC Millay and a foreign power that would render him an agent of a foreign power.

Since the involvement of an agent of a foreign power is a prerequisite to the existence of foreign intelligence information, there can be no foreign intelligence information in this case, nor probable cause to believe that SPC Millay's property would contain such information. Therefore, the FISA-authorized search was improper, and evidence derived therefrom should be suppressed.

### D.  The FISA Applications May Have Lacked the Statements and Certifications Required by Statute

The Court should closely examine each FISA application to ensure that they satisfy each of the statute's requirements.  As the Ninth Circuit has declared in the Title III context, "[t]he procedural steps provided in the Act require 'strict adherence,'" and "utmost scrutiny must be exercised to determine whether wiretap orders conform to [the statutory requirements]." *United States v. Blackmon*, 273 F.3d 1204, 1207 (9th Cir. 2001).

---

[8] The definitions in § 1801(e)(2) are inapplicable, because they concern information with respect to a foreign power or foreign territory, and there is no foreign territory involved in SPC Millay's case.

## 1. The FISA applications may not have included the required statements

When reviewing the FISA applications, the court must ensure that any application for an order approving FISA surveillance or physical searches meets all of the criteria under 50 U.S.C. §§ 1804(a) [9], 1823(a)[10], including, but not limited to, statements setting forth a description of the

---

[9] 50 U.S.C. § 1804(a) provides:

Each application for an order approving electronic surveillance under this subchapter shall be made by a Federal officer in writing upon oath or affirmation to a judge having jurisdiction under section 1803 of this title. Each application shall require the approval of the Attorney General based upon his finding that it satisfies the criteria and requirements of such application as set forth in this subchapter. It shall include—
(1) the identity of the Federal officer making the application;
(2) the identity, if known, or a description of the specific target of the electronic surveillance;
(3) a statement of the facts and circumstances relied upon by the applicant to justify his belief that—
    (A) the target of the electronic surveillance is a foreign power or an agent of a foreign power; and
    (B) each of the facilities or places at which the electronic surveillance is directed is being used, or is about to be used, by a foreign power or an agent of a foreign power;
(4) a statement of the proposed minimization procedures;
(5) a description of the nature of the information sought and the type of communications or activities to be subjected to the surveillance;
(6) a certification or certifications by the Assistant to the President for National Security Affairs, an executive branch official or officials designated by the President from among those executive officers employed in the area of national security or defense and appointed by the President with the advice and consent of the Senate, or the Deputy Director of the Federal Bureau of Investigation, if designated by the President as a certifying official—
    (A) that the certifying official deems the information sought to be foreign intelligence information;
    (B) that a significant purpose of the surveillance is to obtain foreign intelligence information;
    (C) that such information cannot reasonably be obtained by normal investigative techniques;
    (D) that designates the type of foreign intelligence information being sought according to the categories described in section 1801 (e) of this title; and
    (E) including a statement of the basis for the certification that—
        (i) the information sought is the type of foreign intelligence information designated; and
        (ii) such information cannot reasonably be obtained by normal investigative techniques;
(7) a summary statement of the means by which the surveillance will be effected and a statement whether physical entry is required to effect the surveillance;
(8) a statement of the facts concerning all previous application that have be made to an judge under this title involving any of the persons, facilities, or places specified in the application, and the action taken on each previous application; and
(9) a statement of the period of time for which the electronic surveillance is required to be maintained, and if the nature of the intelligence gathering is such that the approval of the use of electronic surveillance under this title should not automatically terminate when the described type of information has first been obtained, a description of facts supporting the belief that additional information of the same type will be obtained thereafter.

[10] 50 U.S.C. § 1823(a) provides:

Each application for an order approving a physical search under this subchapter shall be made by a Federal officer in writing upon oath or affirmation to a judge of the Foreign Intelligence Surveillance Court. Each application shall require the approval of the Attorney General based upon the Attorney General's finding that it satisfies the criteria and requirements for such application as set forth in this subchapter. Each application shall include—
    (1) the identity of the Federal officer making the application;
    (2) the identity, if known, or a description of the target of the search, and a description of the premises or property to be searched and of the information, material, or property to be seized, reproduced, or altered;
    (3) a statement of the facts and circumstances relied upon by the applicant to justify the applicant's belief that—

Case 3:13-mc-00005-RRB   Document 16   Filed 03/04/13   Page 39 of 55

nature of the information sought and the type of communications or activities to be subjected to surveillance and stating the proposed minimization procedures. Additionally, since the physical searches involved a search of the residence of a United States person, the government must include a statement from the Attorney General describing "what investigative techniques [had] previously been utilized to obtain the foreign intelligence information concerned and the degree to which [those] techniques resulted in acquiring such information." 50 U.S.C. § 1823(a)(7). This Court should review any and all FISA applications to determine compliance with sections 1804(a) and 1823(a). To the extent that the initial application and/or subsequent applications did not meet these requirements, the FISA-derived evidence should be suppressed.

### 2. The FISA applications may not have included the required certifications

In addition to checking that every statement required by FISA was included, the Court should review the FISA applications to determine whether they contain all of the certifications required by sections 1804(a)(6) and 1823(a)(6).

---

(A) the target of the physical search is a foreign power or an agent of a foreign power;
(B) the premises or property to be searched contains foreign intelligence information; and
(C) the premises or property to be searched is or is about to be owned, used, possessed by, or is in transit to or from a foreign power or an agent of a foreign power;
(4) a statement of the proposed minimization procedures;
(5) a statement of the nature of the foreign intelligence sought and the manner in which the physical search is to be conducted;
(6) a certification or certifications by the Assistant to the President for National Security Affairs, an executive branch official or officials designated by the President from among those executive branch officers employed in the area of national security or defense and appointed by the President, by and with the advice and consent of the Senate, or the Deputy Director of the Federal Bureau of Investigation, if designated by the President as a certifying official—
(A) that the certifying official deems the information sought to be foreign intelligence information;
(B) that a significant purpose of the search is to obtain foreign intelligence information;
(C) that such information cannot reasonably be obtained by normal investigative techniques;
(D) that designates the type of foreign intelligence information being sought according to the categories described in section 1801 (e) of this title; and
(E) includes a statement explaining the basis for the certifications required by subparagraphs (C) and (D);
(7) where the physical search involves a search of the residence of a United States person, the Attorney General shall state what investigative techniques have previously been utilized to obtain the foreign intelligence information concerned and the degree to which these techniques resulted in acquiring such information; and
(8) a statement of the facts concerning all previous applications that have been made to any judge under this subchapter involving any of the persons, premises, or property specified in the application, and the action taken on each previous application.

36

The Court should examine one certification with particular care – that the FISA authorization was necessary because "such information [could not] reasonably be obtained by normal investigative techniques." 50 U.S.C. §§ 1804(a)(6)(C), 1823(a)(6)(C). Since SPC Millay is a United States citizen, if this certification is found to be "clearly erroneous on the basis of the statement made under [sections 1804(a)(7)(E)(ii) and 1823(a)(6)(E)]" the FISA order should not have been granted, and the FISA-derived evidence must be suppressed.

Although courts have not analyzed FISA's "necessity" requirement, they have done so with the parallel requirement found in Title III, 18 U.S.C. § 2518(1)(c), and that analysis is relevant here. *See United States v. Koyomejian*, 946 F.2d 1450, 1456 (9th Cir. 1991) ("in drafting FISA Congress used Title III as its model, particularly for procedures relating to necessity."). In the Title III context, examples of normal investigative techniques include: physical surveillance; the use of confidential informants; the use of grand jury subpoenas and/or interviews; search warrants; pen registers; telephone records; and the use of undercover officers. *United States v. Bailey*, 607 F.2d 237, 242 (9th Cir. 1979). The Title III necessity requirement was "not enacted to force the government to exhaust all other investigative procedures before resorting to a request to wiretap. On the other hand, electronic surveillance may not be used as the first step in a criminal investigation. [The necessity requirement] serves to ensure that electronic surveillance is not used in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Orozco*, 630 F. Supp. 1418, 1507 (S.D. Cal. 1986) (internal citations omitted).

In this case, the government could have, and did, use normal investigative techniques. Within days of beginning electronically surveilling SPC Millay, the government initiated its sting operation, having 'Natalia,' an undercover FBI agent, contact SPC Millay. The

37

government continued its sting operation until the time when SPC Millay was arrested, and 'Natalia' served as the primary vehicle through which the government collected evidence. Bearing in mind the purpose of the necessity requirement, for the government to assert that the information it sought could not be obtained through normal investigative techniques and then to immediately employ normal investigative techniques shows that the certification required in its FISA applications was, on its face, clearly erroneous—rendering the FISA order invalid.

Alternatively, if the government felt that it needed to use electronic surveillance, it should have sought an order under Title III and not FISA. From the start of its surveillance, the government was investigating SPC Millay for crimes related to espionage, for which Title III surveillance is more appropriate. *See* 18 U.S.C. § 2518(3)(a) (authorizing electronic surveillance for law enforcement purposes if "there is probable cause for belief that an individual is committing, has committed, or is about to commit" certain offenses, including those related to espionage). The government should not be allowed to circumvent the more stringent requirements of Title III electronic surveillance simply by asserting – without basis – that a significant purpose of its investigation is to collect foreign intelligence. Congress did not intend for FISA to replace Title III for domestic criminal investigations. *See In re Sealed Case*, 310 F.3d at 738.

Therefore, the government's certification that it could not have obtained the information sought via the FISA authorization through normal investigative techniques is clearly erroneous, and the FISA-derived evidence should be suppressed.

### E. The Government May Have Failed to Set out And/ Or Comply with the Minimization Procedures Required by Statute

In order to obtain a valid FISA order, the government must include in its application a "statement of the proposed minimization procedures." 50 U.S.C. §§ 1804(a)(4), 1823(a)(4). The purpose of these minimization procedures is to (a) ensure that surveillance is reasonably designed to minimize the acquisition and retention of private information regarding people who are being wiretapped; (b) prevent dissemination of non-foreign intelligence information; and (c) prevent the disclosure, use, or retention of information for longer than seventy-two hours unless a longer period is approved by Court order. 50 U.S.C. § 1801(h). The FISC must find that the government's proposed minimization procedures comply with sections 1805(a)(3) and 1824(a)(3). As FISA involves particularly intrusive electronic surveillance – FISA interception is a "24/7" operation in which all conversations are captured, with minimization occurring later and in other forms – protection of private information through mandated minimization procedures is critically important.

In this case, the FISA application may not have contained adequate minimization procedures or, if it did, those procedures may not have been followed. The Court should make determinations on the adequacy of both proposed and implemented minimization procedures.

### F. The FISA Applications May Have Been Based on Illegitimate And/Or Illegal Sources of Information

This Court should determine whether the information in the government's FISA applications was generated by illegitimate and/or illegal sources and means, such as the constitutionally infirm FISA Amendments Act or the Patriot Act provisions. In addition, the Court should require the government to disclose whether information in the FISA applications,

information in any way underlying the FISA applications, or information used in the investigation of SPC Millay, originated from any of the illegitimate surveillance mechanisms listed below. SPC Millay's counsel requests that the Court review the FISA applications in light of the facts and arguments below.

### 1. The FISA applications may have been based on information obtained through surveillance based on the FISA Amendments Act

The Court should examine whether the FISA applications and other materials contain, or were based on, the authority provided in 50 U.S.C. §1881a, enacted in 2008 as part of the FISA Amendments Act of 2008, Pub. L. No. 110-261 (2008) [hereinafter "FAA"], or whether the government in this case conducted any surveillance of SPC Millay or gathered any evidence based on the FAA.

Under the FAA, unlike the traditional FISA warrant application, the government need not identify the particular targets or facilities to be monitored in its application for surveillance authorization. *Amnesty Int'l USA v. Clapper*, 638 F.3d 118, 124 (2d Cir. 2011), *cert. granted*, 132 S. Ct. 2431, 182 L. Ed. 2d 1061 (2012) (discussing the differences between the FAA and FISA as an initial inquiry prior to determining whether plaintiffs had standing to challenge the constitutionality of the FAA). Rather, the Attorney General ("AG") and Director of National Intelligence ("DNI") need only submit written certification and affidavits generally attesting that "a significant purpose of the acquisition is to obtain foreign intelligence information." *Id.*; 50 U.S.C. § 1881a(g)(2)(A)(v). The targeting procedures are designed to ensure that the surveillance is limited to persons located outside of the United States. *Id.* § 1881a(d)(1), 1881a(g)(2)(A)(i)(I).

The FAA provisions, codified at 50 U.S.C. §1881a, raise several constitutional issues. Most significantly, even if the court finds that traditional FISA warrants satisfy the Fourth

Amendment's probable cause requirements, *see* Part III, *supra*, the FAA authorization process certainly does not. The FAA authorizes the targeting of non-U.S. persons without any indication that they are suspected of being an agent of a foreign power, suspected of terrorism, suspected to pose any national security threat, or suspected of any other criminal offense, so long as the collection of foreign intelligence information is a significant purpose of the surveillance. 50 U.S.C. § 1881a(g)(2); *see also Clapper*, 638 F.3d at 124. Thus, the FAA contains no meaningful probable cause requirement.

In addition, the FAA authorizes extremely broad and sweeping forms of surveillance. *Clapper*, 638 F.3d at 126 (reciting the plaintiffs' claims that the new authorization provisions can be significantly broader under the FAA than they previously could have been, and commenting that the government had not challenged the characterization). Given the difficulty of determining the locations of the senders and receivers of communications, the government can monitor conversations between foreign surveillance targets and US citizens so long as they are not aware of the fact that one of the parties involved is a US citizen or is located within the United States. *See* 50 U.S.C. § 1881a(b). These provisions eviscerate the Fourth Amendment requirement that warrants be issued only upon prior judicial authorization based on an individualized determination of probable cause, and particularizing the place to be searched and the items to be seized. *See Dalia,* 441 U.S. at 255.

Additionally, the FAA fails to meet Fourth Amendment warrant requirements in that it fails to provide any form of meaningful juridical review. The FAA makes the FISC review virtually meaningless by failing to provide adequate details about the targets of surveillance to the FISC, and leaves the determination of individualized monitoring exclusively to the Executive branch. *See Clapper*, 638 F.3d at 140 ("The FAA does not require or even permit the FISC to

41

make an independent determination of the necessity or justification for the surveillance. It verges on the fanciful to suggest that the government will more than rarely fail to comply with the formal requirements of the FAA once it has decided that the surveillance is warranted."). The FISC is left only to determine whether or not the appropriate certifications are made. *Id.*; *see also* §§ 1881a(i)(2), 1881a(i)(3)(A).

If any part of the FISA surveillance was conducted pursuant to §1881a, SPC Millay moves to suppress any interceptions, and their fruit. Accordingly, the Court should examine the nature, genesis, and provenance of the information in the FISA application, and compel the government to disclose whether any such information was the product of surveillance authorized pursuant to the FAA.

### 2. The FISA applications may have been based on information obtained through surveillance based on the Patriot Act

The Court should also examine whether any information in the FISA applications was the product of surveillance requested and conducted pursuant to the authority provided in the Patriot Act. Enacted in October 2001, the Patriot Act modified existing law and created new authorities for electronic surveillance and foreign intelligence gathering, including: permitting "roving" surveillance, Patriot Act § 206 (codified at 50 U.S.C. § 1805); allowing for an application for FISA surveillance when foreign intelligence gathering is a "significant" rather than "primary" purpose, § 218 (codified at 50 U.S.C. §§ 1804, 1823); expanding the Posse Comitatus Act exceptions, § 104 (codified at 18 U.S.C. § 2332e); authorizing "sneak and peek" search warrants, § 213 (codified at 18 U.S.C. § 3103a); permitting nationwide and perhaps worldwide execution of warrants in terrorism cases, § 220 (codified at scattered sections of Titles 18, 31, and 50); and easing government access to confidential information, § 505 (codified at 18 U.S.C. § 2709, 12

U.S.C. § 3414, 15 U.S.C. § 1681u) & § 507 (codified at 20 U.S.C. § 1232). *See also* Charles Doyle, THE USA PATRIOT ACT: A SKETCH, Congressional Research Service 2002, *available at* http://www.fas.org/irp/crs/RS21203.pdf. These new provisions raise constitutional issues. If the information contained in the FISA applications was the product of surveillance requested and conducted pursuant to these provisions of the Patriot Act, SPC Millay intends to move to suppress any interceptions and their fruit.

The government made its FISA application in this case after SPC Millay made a series of telephone call to the Russian Embassy on June 17 and 18. Apart from these calls, SPC Millay had not engaged in any other acts or behavior that would have raised the suspicions of the government or caused the commencement of a criminal FBI investigation. Therefore, the FISA application likely was based upon the contents of that initial telephone call, which may itself have been intercepted pursuant to FISA, the FAA, or the USA Patriot Act. Accordingly, the Court should examine the nature, genesis, and provenance of the information in the FISA application, and compel the government to disclose whether any such information was the product of surveillance was authorized pursuant to the Patriot Act.

3. **The FISA applications and materials may have contained or been based on unreliable "raw intelligence reports"**

The Court should determine whether the FISA applications or materials were based on raw intelligence. Raw intelligence is unreliable because it is untested and unverified. *See Parhat v. Gates*, 532 F.3d 834, 848-50 (D.C. Cir. 2008) (finding that raw evidence presented without backup documents or reliability assessments was unreliable and insufficient to meet the procedures required in Combatant Status Review Tribunal); *Bensayah v. Obama*, 610 F.3d 718, 726 (D.C. Cir. 2010) (finding that there was not enough corroborative evidence to support

43

reliance on raw evidence in a habeas proceeding). Raw intelligence that is speculative and unverified cannot form the basis for probable cause. *See Parhat*, 532 F.3d at 848-50 (ordering the release of Parhat because of a lack of necessary evidence to prove his enemy combatant status, after the finding that the only evidence presented was unreliable raw intelligence).

### G. The FISA Applications May Have Contained Intentional or Reckless Falsehoods or Omissions, Requiring a *Franks* Hearing

The Supreme Court's landmark decision in *Franks v. Delaware*, 438 U.S. 154 (1978), established the circumstances under which the target of a search may obtain an evidentiary hearing concerning the veracity of the information set forth in a search warrant affidavit. As the Court in *Franks* instructed:

> Where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statements are necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.

*Id.* at 156-57.

The *Franks* opinion also sets a similar standard for suppression following the evidentiary hearing:

> In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

*Id.* at 156; *see Blackmon*, 273 F.3d at 1208-10 (applying *Franks* to Title III wiretap application); *United States v. Meling*, 47 F.3d 1546, 1553-56 (9th Cir. 1995) (same); *United States v. Duggan*, 723 F.2d 59, 77 n.6 (2d Cir. 1984) (suggesting that *Franks* applies to FISA applications under Fourth and Fifth Amendments); *United States v. Hammond*. 351 F.3d 765, 770-71 (6th Cir.

2003) (applying *Franks* principles).

The *Franks* principles apply to omissions as well as to false statements. *See*, *e.g., United States v. Carpenter,* 360 F.3d 591, 596-97 (6th Cir. 2004); *United States v. Atkin*, 107 F.3d 1213, 1216-17 (6th Cir. 1997). Omissions will trigger suppression under *Franks* if they are deliberate or reckless, and if the search warrant affidavit, with omitted material added, would not have established probable cause. *See, e.g. id*.

In this case, there may have been significant omissions or reckless statements in the FISA application(s). SPC Millay asserts that his contacts with the Russian Embassy were for the purpose of being put in contact with Russian soldiers so that he could communicate with them, and that to attribute a clandestine intelligence purpose to the same is a mischaracterization of the calls. That SPC Millay did not intend to engage in clandestine intelligence activity is further evidenced by the fact that on September 16, 2011, SPC Millay reported his contacts with 'Natalia' to both his military chain of command and the FBI. Absent undisputable evidence to the contrary, a *Franks* hearing is appropriate in this case.

Without the opportunity to review the FISA applications, SPC Millay and his counsel cannot identify additional specific false statements or material omissions in those applications. That lack of access prevents defense counsel from making the showing that *Franks* ordinarily requires. Nevertheless, the possibility that the government has submitted FISA applications with intentionally or recklessly false statements or material omissions is hardly speculative. For instance, in 2002, in *In re All Matters*, 218 F. Supp. 2d at 620-21, the FISC reported that beginning in March 2000, the Department of Justice ("DoJ") had confessed "error in some 75 FISA applications related to major terrorist attacks directed against the United States. The errors related to misstatements and omissions of material facts," including: "75 FISA applications

related to major terrorist attacks directed against the United States" contained "misstatements and omissions of material facts"; the government's failure to apprise the FISC of the existence and/or status of criminal investigations of the target(s) of FISA surveillance; and improper contacts between criminal and intelligence investigators with respect to certain FISA applications. 218 F. Supp. 2d at 620-21.

According to the FISC, "[i]n March of 2001, the government reported similar misstatements in another series of FISA applications . . ." *Id*., at 621. A report issued March 8, 2006 by the DoJ Inspector General stated that the FBI found apparent violations of its own wiretapping and other intelligence-gathering procedures more than 100 times in the preceding two years. *See* Report to Congress on Implementation of Section 1001 of the USA Patriot Act, March 8, 2006 (hereinafter "DoJ IG Report"), *available at* http://www.usdoj.gov/oig/special/s0603/final.pdf.

For the reasons stated above, a *Franks* hearing, and disclosure of the underlying FISA materials are necessary in order to permit SPC Millay the opportunity to prove that the affiants before the FISC intentionally or recklessly made materially false statements and omitted material information from the FISA applications.

## V.   THE COURT SHOULD DIRECT THE GOVERNMENT TO PROVIDE THE FISA APPLICATIONS AND MATERIALS TO SPC MILLAY'S COUNSEL BECAUSE THE STATUTE AND DUE PROCESS REQUIRE DISCLOSURE IN THIS CASE

Disclosure to defense counsel of the FISA applications and underlying materials is not always authorized or appropriate, but for the reasons set forth below, disclosure in this case is not only appropriate, but is required by the FISA statute and the Due Process Clause.

46

## A. Disclosure of the FISA Materials to the Defense is Necessary Under 50 U.S.C. §§ 1806(f), 1825(g)

Sections 1806(f) and 1825(g) authorize this Court to disclose FISA materials to the defense under certain circumstances. According to FISA's legislative history, disclosure may be "necessary" under section 1806(f) where:

> The court's initial review of the application, order, and fruits of the surveillance indicates that the question of legality may be complicated by factors such as 'indications of possible misrepresentation of fact, vague identification of the persons to be surveilled, *or surveillance records which include a significant amount of non foreign intelligence information*, calling into question compliance with the minimization standards contained in the order.'"

*United States v. Belfield*, 692 F.2d 141, 147 (D.C. Cir. 1982) (*quoting* S. REP. NO. 701, 95th Cong., 2d Sess. 64 (1979)) (emphasis added); *see, e.g.*, *United States v. Ott*, 827 F.2d 473, 476 (9th Cir. 1987) (same); *Duggan*, 743 F.2d at 78 (same).

Here, disclosure of the FISA applications and materials is justified and indeed necessary, for several reasons. First, with access to the FISA applications, defense counsel could more ably demonstrate that the requisite probable cause relating to "an agent of a foreign power" was not met. Second, defense counsel could more ably demonstrate that the FISA application was based upon protected First Amendment activity. Third, defense counsel could more ably demonstrate that the information underlying the FISA application was obtained via illegal means. Fourth, defense counsel could help identify procedural irregularities, especially with respect to minimization procedures. Finally, circumstances like the ones involving SPC Millay, where records include a significant amount of non foreign intelligence information, are exactly those that Congress envisioned would necessitate disclosure.

If the FISA application and materials were disclosed to defense counsel, there would be no threat of disclosure to the public, or to unauthorized persons, whatsoever. SPC Millay's military

defense counsel, Capt. Joy Premo possesses top secret security (TS-SCI) clearance and is a United States government employee working for the United States Army. SPC Millay's civilian defense counsel, Charles Swift, also possesses secret security clearance and has received and reviewed, without incident, classified information in more than 5 federal and military criminal cases, including this one.  In addition, the Court can issue an appropriate Protective Order, to which SPC Millay's counsel would consent, to provide adequate protection for classified and sensitive information, including a provision that such materials would be disclosed to defense counsel but not to the defendant. *See e.g.* Classified Information Procedures Act (hereinafter "CIPA"), 18 U.S.C. App. III, at §3.

Although no district court has previously ordered disclosure of FISA applications, orders, or related materials to the defense, this case is unique. S*ee, e.g., In re Grand Jury Proceedings*, 347 F.3d 197, 203 (7th Cir. 2003) (citing cases).  In virtually every other case involving a motion to suppress FISA derived evidence, the same district court reviewing the motion also presided over the defendant's criminal case. Therefore, the district court having reviewed the charges and the legal issues therein, heard discovery disputes, and determined some pre-trial motions, was intimately familiar with the facts and the applicable law of the case. By contrast, here the entire criminal proceeding occurs before a military judge, the charges are based in military law, and the applicable procedures are based in military rules. This court lacks the same familiarity with the laws and facts of this case, and therefore allowing the defense to review the FISA applicants and make further arguments in support of this motion is all the more important.[11]

---

[11] To the defendant's knowledge, there are only two other cases in which the military court presiding over the case transferred the motion to suppress FISA-derived evidence to district court. *See United States v. Ott*, 827 F.2d 473 (9th Cir. 1987); *United States v. Horton*, 17 M.J. 1131 (U.S. Navy-Marine Corps C.M.R. 1984). In neither case is there evidence that the defendants challenged the removal to district court for review of the FISA materials. In failing to do so, the defendants waived their rights to challenge the removal to district court. Therefore, the procedure in these decisions should not influence this Court as to the proper procedure in this case.

Sections 1806(f) and 1825(g) authorize courts to grant disclosure of FISA applications to the defense in appropriate cases. Under these unusual circumstances, disclosure is warranted, else sections 1806(f) and 1825(g) would be rendered superfluous.

**B. Disclosure of the FISA Materials to the Defense is Necessary Under 50 U.S.C. §§ 1806(g), 1825(h), and the Due Process Clause**

Separately, the defense is entitled to disclosure of the FISA applications, orders, and related materials under sections 1806(g) and 1825(h), which expressly incorporate the Fifth Amendment Due Process Clause, and provide that "[i]f the court determines that the surveillance was lawfully authorized and conducted, it shall deny the motion of the aggrieved person *except to the extent that due process requires discovery or disclosure*." 50 U.S.C. §§ 1806(g), 1825(h) (emphasis added); *See also United States v. Spanjol*, 720 F. Supp. 55, 57 (E.D. Pa. 1989) ("[u]nder FISA, defendants are permitted discovery of materials only to the extent required by due process. That has been interpreted as requiring production of materials mandated by [*Brady*], essentially exculpatory materials").

For the same reasons explained above, the court should disclose the FISA applications, orders and materials to defense counsel in order to allow defense counsel to review exculpatory information in those materials. As explained, unlike the ordinary criminal case in which the district court presides over trial as well as the motion to suppress FISA derived evidence, this case is unique. This Court is neither familiar with the underlying facts, nor the military law under which SPC Millay will be tried. Therefore, the Court is less able to determine whether the FISA-related materials contain exculpatory evidence. Due process and sections 1806(g) and 1825(h) therefore require disclosure of the FISA-related materials to SPC Millay's counsel to assist in that determination.

49

## <u>CONCLUSION</u>

For all of the reasons set forth above, SPC Millay respectfully requests that the Court review the FISA applications and related materials in accordance with the argument set forth in this brief, direct the government to disclose the necessary information as appropriate under 50 U.S.C. §§ 1806(f) and 1806(g), and order suppression of evidence in SPC Millay's court-martial as appropriate under § 1806(f).

DATED this 1st day of March, 2013.

Respectfully submitted,

*s/ Charles D. Swift*
Charles D. Swift
Attorney for William Millay
Swift & McDonald, P.S.
1809 – 7th Avenue, Suite 1108
Seattle, WA 98101
(206) 441-3377
cswift@prolegaldefense.com
WA State Bar No. 41671

50

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was
served on March 4, 2013, via ECF on:

Steven Skrocki, US Attorney
Deborah Curtis, US Attorney

s/ Charles D. Swift
Attorney for Defendant, William Colton Millay